UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | | |
|---|---|---|
| MICHAEL HAWKS, | ) | |
| FRANKLIN HUTCHINS, | ) | |
| STEVEN KING, | ) | CASE NO: 08BA-CV03912 |
| RONALD MARLOW, | ) | |
| Plaintiffs, | ) | |
| v | ) | |
| MEDTRONIC, INC., and MEDTRONIC INTERNATIONAL TECHNOLOGY, INC. | ) | |
| Defendants | ) | |

**COMPLAINT**

Plaintiffs, MICHAEL HAWKS, FRANKLIN HUTCHINS, STEVEN KING, and RONALD MARLOW by and through counsel Cook, Vetter, Doerhoff and Landwehr, P.C., for their Complaint state as follows:

**Parties**

1. Michael Hawks is a Missouri resident who lives in Warsaw, Benton County, Missouri.

2. Franklin Hutchins is a Missouri resident who lives in Warsaw, Benton County, Missouri.

3. Steven King is a Missouri resident who lives in Hermitage, Hickory County, Missouri.

4. Ronald Marlow is a Missouri resident who lives in Iberia, Miller County, Missouri.

5. Defendant Medtronic, Inc. is a Minnesota corporation with its principal place of business at 710 Medtronic Parkway, Minneapolis, Minnesota 55432 Defendant Medtronic, Inc can be served through its registered agent, The Corporation Company, 120 South Central Ave, Clayton, MO 63105.

6 Defendant Medtronic Technology International, Inc., formerly known as Medtronic Puerto Rico, Inc is a corporation existing by virtue of the laws of the Territory of Puerto Rico, with its principal place of business at Road 149, km 56 3, Box 6001, Villalba, PR. Upon information and belief this defendant can be served through The Corporation Company, 120 South Central Ave , Clayton, MO 63105.

7 Medtronic Technology International, Inc is a wholly owned subsidiary of Medtronic, Inc and together these companies formulate, develop, manufacture, sterilize, and sell the medical devices that are at issue in this Complaint Hereinafter the defendants will be referred to jointly as "Medtronic."

## Jurisdiction and Venue

8 This Court has diversity jurisdiction over this case pursuant to 28 U S.C §1332 as there is complete diversity between the plaintiffs and defendants and the amount in dispute exceeds $75,000.

9. Venue in this judicial district is proper pursuant to 28 US C § 1391(a) because the plaintiffs reside in this judicial district where a substantial part of the events giving rise to the claims at issue arose.

## Facts

10 Medtronic designs, researches, develops, manufactures, tests, markets, advertises, promotes, distributes, and sells products that treat cardiac arrhythmias, heart

failure, and coronary and peripheral vascular disease. An arrhythmia is an irregular cardiac rhythm, which can cause significantly decreased cardiac output and ultimately death. Medtronic holds itself out as "the global leader in medical technology, alleviating pain, restoring health and extending life for millions of people around the world."

11. A number of devices designed to detect and treat abnormally fast and irregular heart rhythms and to provide pacing for improper heart rhythms are available from Medtronic and other manufacturers, including implantable cardiac defibrillators ("ICDs"). ICDs contain pacemakers as well as defibrillators. While a pacemaker is used primarily to correct slow heart rates, an ICD detects and corrects both fast and slow heart rates. The pacemaker portion corrects the slow rates and the anti-tachycardia portion can "over-drive pace" rapid rates. The defibrillator portion can shock ventricular tachycardia and ventricular fibrillation to stop the heart and allow an appropriate rhythm to take over.

12. ICDs are designed to be implanted primarily under the skin of the chest wall. The device's power source, or pulse generator, is implanted in a pouch formed in the chest wall, generally over the left pectoralis major muscle.

13. Typically, wires called leads are inserted through a major vein and attached directly to the muscle on the inside of the heart. Electrodes that sense the heart's rhythm are built into the lead wires and positioned in the heart, where they monitor the heartbeat and can administer an electric shock to abort a dangerous over-drive pace," a very rapid rhythm, or pace the heart at a normal rhythm if an irregularity is detected.

14. Such devices are used in patients, like the plaintiffs, who have arrhythmias or irregular heartbeats that are considered life-threatening. People with these medical problems are at risk for ventricular fibrillation (rapid, ineffective contraction of the ventricles of the heart) or ventricular tachycardia (excessively rapid heartbeat) that is

poorly controlled by medication These arrhythmias or irregular heart beats can result in the loss of consciousness or death, unless the patient receives therapy from an appropriate device to put the heart back into an appropriate cardiac rhythm.

15 If an implanted ICD and its leads operate properly, the system can save a patient's life. If either fails to operate, the patient may die within minutes.

16. This Action seeks recovery for the plaintiffs who have been implanted with Sprint Fidelis leads marketed by Medtronic under the model number 6930, 6931, 6948 and/or 6949

17 At all times relevant, this Sprint Fidelis lead was researched, developed, manufactured, marketed, promoted, advertised, sold, and distributed by Medtronic to be used in connection with ICDs

18. The majority of ICDs now use two or three leads. As a result, smaller high-voltage leads are attractive to electrophysiologists because they are believed to be easier to insert, and are less likely to obstruct blood flow or distort the tricuspid valve The Medtronic Sprint Fidelis leads are smaller high voltage leads

19 In 2001, Medtronic marketed its then-smallest defibrillation lead called the Sprint Quattro Secure, model 6947 ("Quattro leads").

20. In 2004, Medtronic introduced and marketed the Sprint Fidelis to replace the Sprint Quattro as the high voltage lead of choice and to attempt to gain a larger market share.

21 At the time that Medtronic announced the marketing of the Sprint Fidelis leads, Medtronic claimed that [t]he small size of the Sprint Fidelis (Fidelis is a Latin word that means 'faithful') helps improve passage into a patients venous system for an

easier implant, and minimizes venous obstruction " Medtronic also referred to the leads as "state-of-the-art " *See* Medtronic News Release (Sept 2, 2004), available at http://wwwp.medtronic.com/Newsroom/NewsReleaseDetails.do?itemId=1 095281834568&fangen US.

22. Medtronic further represented that the Splint Fidelis leads were based on the "proven" design of the Quattro leads.

23 The Sprint Fidelis leads were approved for sale by the United States Food and Drug Administration (the "FDA") in September 2004 and have been implanted in over 160,000 patients worldwide

24 The Sprint Fidelis lead is a 66 French[1] isodiametric multifilar true bipolar high voltage lead with silicone insulation and polyurethane outer coating.

25. The Sprint Fidelis lead models 6949 and 6948 have two high voltage coils; the 6930 and 6931 models have a single right ventricular high voltage coil. As of January 2007, approximately 144,311 model 6949 Sprint Fidelis leads, 7510 model 6948 leads, 5387 model 6931 leads, and 236 model 6930 leads had been implanted.

26 Since the Sprint Fidelis leads were introduced to the market, it has become evident that a significant portion of the leads have potentially fatal defects

27. Such defects were discussed in an article written by doctors at The Minneapolis Heart Institute, one of the premier heart institutes in the world, based on a study of the incidence of lead failures in the Sprint Fidelis models compared to the Sprint Quattro models According to the report, which was prepared by Dr. Robert G. Hauser, *et al*, and published in the Heart Rhythm Society Journal in the Spring of 2007, "Early

---

[1] French is a measure of circumference in this instance One French is equal to 0 33 mm, or approximately 0 012 inches

Failure of Small-Diameter High-Voltage Inflammable Cardioverter-Defibrillator Lead," Heart Rhythm Society 2007 03.041 (2007) ("Early Failure"), the Minneapolis Heart Institute's experience reflected that, between September 2004 and February 2007, 583 patients were implanted with Sprint Fidelis Model 6949 leads, and nine patients received other Sprint Fidelis models. During that time, six patients experienced Sprint Fidelis Model 6949 lead failures. The failed Sprint Fidelis Model 6949 leads had been implanted by various electrophysiologists, cardiologists and thoracic surgeons. The average time to failure was fourteen months (based on a range of four to twenty-three months). *Early Failure,* p. 893.

28. The study compared the actuarial survival of the 583 Sprint Fidelis Model 6949 leads implanted at the Minneapolis Heart Institute to the survival of 285 Sprint Quattro Model 6947 leads implanted at the Institute between November 2001 and March 2007. The difference in survival between the Sprint Fidelis Model 6949 lead and the Sprint Quattro Secure Model 6947 lead was significant. The failure rate for the Sprint Fidelis Model 6949 lead was 1-2% during the first two years of implant and was ten times greater than the failure rate for the Sprint Quattro Secure Model 6947 lead. *Early Failure,* p. 894-895.

29. The significant number of lead failures involved lead fractures of the PACE-sense conductor or coil in the Sprint Fidelis Model 6949. The fracture rate for the Sprint Fidelis leads was three times higher than the fracture rate of the Quattro Model 6947. *Early Failure,* p. 894-895.

30. Another study, conducted at Cornell University Medical Center by Sunil Mirchandani, *et al.*, found "(a) 17% incidence of abnormal right ventricular sensing during follow-up of patients implanted with the Medtronic Sprint Fidelis ICD lead,"

necessitating "an early revision of the system in 4% of patients " *See* Abstract of *Defibrillator Leads. Is Smaller Necessarily Better?* 2006, available at http://vivo.library.cornell.edu/entity?home=&id=30168.

31. A review of the FDA's MAUDE database, which contains reports of adverse events associated with the use of medical devices, discloses that, as of July 2007, over 1000 Medical Device Reports ("MDR s) regarding the Sprint Fidelis lead had been filed since September 2004 The most frequent complaints were fracture and inappropriate shocks, and the most common observations were high impedance, oversensing and noise, and failure to capture or high threshold

32. Medtronic analyzed approximately 125 of those leads that were returned to Medtronic before July 2006 According to the relevant MDR reports, Medtronic concluded that 77 out of 125 leads (or 62%) were defective The predominant manifestation of the defect was conductor fracture, involving the PACE-sense conductor and coil or the high voltage (defibrillation) conductor. PACE-sense conductor or coil fracture was manifested by inappropriate shocks or oversensing/noise and high impedance, while high voltage conductor fracture was primarily linked to high impedance.

33. Medtronic filed more than 350 additional MDRs regarding the Sprint Fidelis leads between August 2006 and February 2007. Medtronic did not include similar analysis of those leads in the MDRs filed by Medtronic during this period

34. On March 21, 2007, Medtronic issued a physician advisory, in the nature of a "Dear Doctor Letter," that advised physicians of "the higher than expected conductor fracture rates in ... Splint Fidelis leads " Medtronic claims in that letter to be

investigating reports of lead failures, however, still represents that the Splint Fidelis leads are performing consistent with, and "in line with other Medtronic leads .... And consistent with lead performance publicly reported by other manufacturers." This letter also states, " . variables within the implant procedure may contribute significantly to these fractures ... For conductor fractures that occur around the suture sleeve, our preliminary investigation suggests that under certain implant techniques, the lead appears to be exposed to severe bending or kinking in the pectoral area." At no time prior to this letter did Medtronic warn physicians that its leads must be specially handled during the implantation procedure or that they could "severely bend" or "kink" if they are implanted using certain accepted implant techniques.

35 On October 15, 2007, Medtronic recalled all unimplanted Sprint Fidelis leads, citing several deaths related to the leads Medtronic recommended that implanted Sprint Fidelis leads be monitored.

36. Medtronic's representation of the consistency of the performance of the Sprint Fidelis leads is untrue in light of the reported experience with the leads and the various issues included in the MAUDE database reports.

37 At all times relevant, Medtronic misrepresented the safety of the Sprint Fidelis leads and negligently manufactured, marketed, advertised, promoted, sold, and distributed the leads as safe devices to be used together with ICDs for prophylactic treatment of patients with prior myocardial infarction and decreased ejection fraction, ventricular arrhythmias, and patients who are at high risk for developing such arrhythmias Some patients are dependent on such devices to maintain an appropriate heart rhythm, and therefore, adequate cardiac output For these patients, failure of the leads connected to the ICD can cause sudden faintness, or loss of consciousness, and can

result in death

38. At all times relevant, Medtronic failed to warn that the Sprint Fidelis leads were prone to breakage or that particular processes should be implemented in order to avoid breaking the Sprint Fidelis leads.

39. As a result of their defects, Medtronic's Sprint Fidelis leads suffer fracture, leading to malfunction in the transmission of the electric signal from the ICD to the patient's heart.

40 At all times relevant, the Sprint Fidelis leads (collectively the "leads") were researched, developed, manufactured, marketed, promoted, advertised and sold by Medtronic

41 At all times relevant, Medtronic misrepresented the safety of the Sprint Fidelis leads, and negligently manufactured, marketed, advertised, promoted, sold and distributed the leads as safe and effective devices to be used for implantation with ICDs for prophylactic treatment of patients with prior myocardial infarction and a limited ejection fraction, patients who have had spontaneous and/or inducible life-threatening ventricular arrhythmias, and patients who are at high risk for developing such arrhythmias.

42. At all times relevant to this action, Medtronic knew, and had reason to know, that the Sprint Fidelis leads were not safe for the patients for whom they were prescribed and implanted, because the leads fractured and otherwise malfunctioned, and therefore failed to operate in a safe and continuous manner, causing serious medical problems and, in some patients, catastrophic injuries and deaths.

43. At all times relevant to this action, Medtronic knew, and had reason to know, that its representations that the Sprint Fidelis leads were easier to implant and

based on "proven" technology were materially false and misleading

44. Approximately 129,000 of the affected devices remain in service in the United States and in other countries.

45. As a result of defects, the Sprint Fidelis leads can cause serious physical trauma and/or death. Medtronic knew and had reason to know of this tendency and the resulting risk of injuries and deaths, but concealed this information and did not warn the plaintiffs or their physicians, preventing plaintiffs, and the medical community from making informed choices about the selection of leads for implantation

46 Medtronic designed, manufactured, marketed, promoted, sold, and distributed 4 models of defective leads, including the Sprint Fidelis 6949 LFJ extendable/retractable screw fixation (S) model; the 6948 LFH tuned fixation (T) model; the 6931 LFT S fixation; and the 6930 LFK fixation (T) model All of the aforementioned models are defective.

47. The Splint Fidelis leads were originally approved for sale by the FDA in September 2004

48 The Sprint Fidelis leads are defective in that they are prone to fracture of the pace-sense conductor and coil and the HV conductor, causing them to fail to function in a manner which may not be immediately detectable by the patient. The malfunctioning can lead to terrifying inappropriate defibrillation shocks, failure to deliver appropriate (life-giving) defibrillation therapy and death

49. There is no test that predicts whether the Sprint Fidelis leads will fail

50. To this day, Medtronic has refused to suggest replacement of the defective Sprint Fidelis leads in its patients, even though in patients whom these defects have been

discovered, emergency replacement of the leads is required

51 Medtronic's failure to document or follow up on the known defects in its Sprint Fidelis leads, and concealment of known defects from the FDA, plaintiffs, and the medical community constitutes fraudulent concealment that equitably tolls applicable statutes of limitation.

52 Plaintiffs could not have discovered the existence of the defect in the Sprint Fidelis leads until, at least, March 2007, when the first physician advisory was sent by Medtronic to physicians concerning the fragile nature of these leads

53 Medtronic is estopped from relying on the statute of limitations defense because Medtronic actively concealed the lead defects, suppressing reports, failing to follow through on FDA notification requirements, and failing to disclose known defects to physicians Instead of revealing the defects, Medtronic continued to represent its products as safe for their intended use.

54. Medtronic's conduct, as described in the preceding paragraphs, amounts to conduct purposely committed, which Medtronic must have realized was dangerous, heedless and reckless, without regard to the consequences or the rights and safety of plaintiffs

55. Thousands of patients' lives rely upon the proper functioning of these Sprint Fidelis leads, and they - along with their physicians - have been vigorously attempting to assess the risks that they now face

56. Patients and physicians remain uninformed and confused about whether the devices should be explanted, or even whether all of the defects have been disclosed.

57. At all times herein mentioned, each of the defendants was the agent,

servant, partner, aides and abettor, co-conspirator and/or joint venturer of the other defendant herein and was at all times operating and acting within the purpose and scope of said agency, service, employment, partnership, conspiracy and/or joint venture and tendered substantial assistance and encouragement to the other defendant, knowing that their collective conduct constituted a breach of duty owed to the plaintiffs.

58. There exists and, at all times herein mentioned, there existed a unity of interest in ownership between the defendants such that any individuality and separateness between the certain defendants has ceased and each defendant is the alter ego of the other certain defendant and exerted control over the defendant. Adherence to the fiction of the separate existence of these certain defendants as entities distinct from the other certain defendant will permit an abuse of the corporate privilege and would sanction a fraud and/or would promote injustice.

59. At all times herein mentioned, defendants, and each of them, were engaged in the business of, or were successors in interest to, entities engaged in the business of researching, designing, formulating, compounding, testing, manufacturing, producing, processing, assembling, inspecting, distributing, marketing, labeling, promoting, packaging, prescribing and/or advertising for sale, and selling products for use by the plaintiffs. As such, each defendant is individually, as well as jointly and severally, liable to the plaintiffs for his damages.

60. At all times herein mentioned, the officers and/or directors of the defendants named herein participated in, authorized and/or directed the production and promotion of the aforementioned products when they knew, or with the exercise of reasonable care and diligence should have known, of the hazards and dangerous propensities of said products, and thereby actively participated in the tortious conduct that

resulted in the injuries suffered by the plaintiffs.

61. On or about July 16, 2007, Plaintiff Michael Hawks received a defective lead wire manufactured by Medtronic resulting in pain and discomfort and requiring increased medical monitoring and adjustment.

62. On or about November 21, 2006, Plaintiff Franklin Hutchins received a defective lead wire manufactured by Medtronic resulting in pain and discomfort and requiring increased medical monitoring and adjustment.

63. On or about May 14, 2007, Plaintiff Steven King received a defective lead wire manufactured by Medtronic resulting in pain and discomfort and requiring increased medical monitoring and adjustment.

64. On or about September 6, 2007, Plaintiff Ronald Marlow received a defective lead wire manufactured by Medtronic resulting in pain and discomfort and requiring increased medical monitoring and adjustment.

65. Medtronic's conduct is and has been wanton and egregious, and punitive damages should be awarded.

**COUNT I**

**(Products Liability)**

66. Plaintiffs re-allege the allegations contained in the foregoing paragraphs.

67. At all relevant times hereto, Medtronic was engaged in the business of designing, manufacturing, assembling, promoting, advertising, selling, and distributing the Sprint Fidelis leads for ultimate sale to, and implantation in, heart disease/disorder patients. Medtronic designed, manufactured, assembled, and sold the Sprint Fidelis leads to hospitals and physicians, knowing that they would be thereby sold to patients with heart

diseases and disorders (including plaintiffs)

68. Medtronic's Sprint Fidelis lead was expected to and did reach plaintiffs without substantial change in its condition as manufactured and sold by Medtronic. In light of the defects described herein, at the time the lead reached plaintiffs, it was in a condition not contemplated by any reasonable person among the expected users of the device, and was unreasonably dangerous to the expected user of the device when used in reasonably expectable ways of handling or consumption

69. The Sprint Fidelis lead designed, manufactured, assembled, and sold by Medtronic to plaintiffs was in a defective condition unreasonably dangerous to any user or consumer of the devices, and plaintiffs were, and are, persons that Medtronic should reasonably have foreseen as being subject to the harm caused by the devices defective condition.

70. Plaintiffs used the lead in the manner in which the lead was intended to be used. This has resulted in injuries to plaintiffs.

71 Plaintiffs were not aware of, and could not in the exercise of reasonable care have discovered, the defective nature of Medtronic's Sprint Fidelis leads, nor could they have known that Medtronic designed, manufactured or assembled the leads in a manner that would increase the risk of bodily injury to plaintiffs.

72 As a direct and proximate result of Medtronic's design, manufacture, assembly, marketing and sales of the Sprint Fidelis leads, plaintiffs have sustained and will continue to sustain severe physical injuries and/or death, severe emotional distress, and economic losses and consequential damages, and are therefore entitled to compensatory relief.

## COUNT II

## (Breach of Implied Warranty)

73. Plaintiffs re-allege the allegations contained in the foregoing paragraphs.

74 Medtronic impliedly warranted that its Sprint Fidelis leads, which Medtronic designed, manufactured, assembled, promoted and sold to plaintiffs, were merchantable and fit and safe for ordinary use Medtronic further impliedly warranted that its Splint Fidelis leads were fit for the particular purpose of providing prophylactic treatment of patients with a variety of medical issues, including prior myocardial infarction and a limited ejection fraction, spontaneous and/or inducible life-threatening ventricular arrhythmias, and a high risk for developing such arrhythmias

75. Medtronic further impliedly warranted that its Sprint Fidelis leads were based on "proven" lead technology and that the Sprint Fidelis leads were easier to implant.

76 Medtronic's Sprint Fidelis leads were defective, unmerchantable, and unfit for ordinary use when sold, and unfit for the particular purpose for which they were sold, and subjected plaintiffs to severe and permanent injuries and death Therefore, Medtronic breached the implied warranties of merchantability and fitness for a particular purpose when its lead was sold to plaintiffs, in that the leads are defective and have fractured and otherwise failed to function as represented and intended

77. As a direct and proximate result of Medtronic's breach of the implied warranties of merchantability and fitness for a particular purpose, plaintiffs have sustained and will continue to sustain severe physical injuries and/or death, severe emotional distress, and economic losses, and are therefore entitled to damages.

## COUNT III

## (Negligence)

78. Plaintiffs re-allege the allegations contained in the foregoing paragraphs

79 Medtronic had a duty to plaintiffs to manufacture and provide a safe product, to notify the FDA of flaws, and to warn the FDA of the defective nature of the Sprint Fidelis leads Medtronic breached its duty of reasonable care to plaintiffs, thereby causing plaintiffs' injuries.

80. Medtronic breached its duty of reasonable care to plaintiffs by manufacturing and assembling the Sprint Fidelis leads in such a manner that they were prone to fracture, failure to operate and malfunction and expose plaintiffs to life-threatening physical trauma.

81 Medtronic breached its duty of reasonable care to plaintiffs by failing to notify the FDA, plaintiffs and the medical community at the earliest possible date of known defects in the leads

82 Medtronic breached its duty of reasonable care to plaintiffs by failing to exercise due care under the circumstances.

83. As a direct and proximate result of the carelessness and negligence of Medtronic as set forth in the preceding paragraphs, plaintiffs have sustained and will continue to sustain severe physical injuries and/or death, severe emotional distress, economic losses and other damages.

## COUNT IV

## (Negligent Infliction of Emotional Distress)

84. Plaintiffs re-allege the allegations contained in the foregoing paragraphs

85. Medtronic carelessly and negligently manufactured, marketed and sold defective Sprint Fidelis leads to plaintiffs, carelessly and negligently concealed these defects from plaintiffs, and carelessly and negligently misrepresented the quality, safety and usefulness of the leads.

86 Plaintiffs were directly involved in and directly impacted by Medtronic's carelessness and negligence, in that plaintiffs have sustained and will continue to sustain severe physical injuries and/or death, economic losses, and other damages as a direct result of the decision to purchase, use and have implanted in their bodies a defective and dangerous product manufactured, sold and distributed by Medtronic

87. Medtronic's misconduct as alleged above have caused plaintiffs to suffer severe emotional trauma, physical consequences and long continued emotional disturbances. Plaintiffs are therefore entitled to compensatory damages.

**COUNT V**

**(Violation of the Missouri Merchandising Practices Act)**

88 Plaintiffs incorporate by reference the allegations contained in the foregoing paragraphs.

89. Plaintiffs purchased the Medtronic device at issue in this case primarily for personal use

90 At the time of the purchase, Medtronic did not disclose relevant information about the device including its propensity to fail, the nature of prior problems with this device in and with other consumers, including, but not limited to, failure and malfunctions causing damage to its users in violation of the Missouri Merchandising Practices Act.

91. As a result of failing to disclose this information, the plaintiffs sustained an ascertainable loss of money in that they paid value for a device that was not defective when in

fact, based on information and belief, the device was defective and worth far less than what plaintiffs paid.

92 By failing to disclose the true nature of the problems with the product at the time of the sale, defendants engaged in outrageous conduct meriting an award of punitive damages.

93 Due to the defective nature of the device in question, plaintiffs have been required to retain counsel and they are entitled pursuant to the Missouri Merchandising Practices Act to recoup those expenses along with other damages caused by the defective product.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for judgment against Medtronic as follows:

1. For compensatory damages according to proof;

2. For punitive or exemplary damages against Medtronic, consistent with the degree of Medtronic's reprehensibility and the resulting harm or potential harm to plaintiffs and in an amount sufficient to punish Medtronic and deter others from similar wrongdoing;

3 For declaratory judgment that Medtronic is liable to plaintiffs for all evaluative, monitoring, diagnostic, preventative, and corrective medical, surgical, and incidental expenses, costs and losses caused by Medtronic's wrongdoing;

4 For an award of attorneys' fees and costs;

5. For prejudgment interest, post-judgment interest, and the costs of suit; and

6. For such other and further relief as this Court may deem just and proper

## JURY DEMAND

Plaintiffs hereby demand a trial by jury in this case as to such issues so triable


/s/Timothy Van Ronzelen

Timothy W. Van Ronzelen MO BAR #44382
Matthew A. Clement MO BAR #43833
Kari A Schulte MO BAR #57739
COOK, VETTER, DOERHOFF & LANDWEHR, P.C.
231 Madison
Jefferson City, Missouri 65101
573/635-7977
573/635-7414 (facsimile)
mclement@cvdl.net
tvanronzelen@cvdl.net
kschulte@cvdl.net

ATTORNEYS FOR PLAINTIFFS